UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES,                  :
                                :
     Plaintiff,                 :
                                :
v.                              :   Case No. 3:20-cr-137(RNC)
                                :
                                :
WILLIAM CARABALLO III,          :
                                :
     Defendant.                 :

RULING AND ORDER

Defendant William Caraballo III has moved to
suppress fentanyl discovered under the driver's seat of
his SUV following a drug-detection dog sniff of the
vehicle's exterior during a traffic stop.  The sniff
occurred approximately 17 minutes after Caraballo was
pulled over.  The main issue raised by the motion to
suppress is whether reasonable suspicion of criminal
activity justified detaining Caraballo beyond the time
required to complete a traffic infraction
investigation.  See Rodriguez v. United States, 575
U.S. 348, 354 (2015).  An evidentiary hearing has been
held, and the parties have submitted post-hearing

briefs.  After careful consideration, I conclude that
reasonable suspicion of drug trafficking justified the
decision to extend the stop until the K-9 was deployed
to sniff the SUV.  I conclude that the defendant's
other arguments are also unavailing and therefore deny
the motion to suppress.

I.

In early 2020, the Connecticut State Police
Statewide Narcotics Task Force was investigating
Caraballo's co-defendant, Cruz Bonilla, for suspected
drug trafficking.  Analysis of Bonilla's cell phone
activity revealed calls with Caraballo and his wife,
which caused the task force to suspect that Bonilla was
being supplied with heroin by Caraballo.  A
confidential informant ("CI") known to the task force
reported witnessing Bonilla obtain a re-supply of
narcotics from his supplier, whom the CI described as
an "Hispanic male, short and stocky with glasses."  The
CI said the supplier was from Pennsylvania and had ties
to New York.  According to the CI, the supplier was

picking up kilograms of heroin in New York and transporting them in duffel bags in a black SUV with Pennsylvania plates to a stash house in the Nutmeg Woods apartment complex in New London.

Detective Leigh Bonkowski, who was leading the task force investigation, went to the apartment complex and saw several vehicles with Pennsylvania plates registered to Caraballo and his wife.  One of the vehicles was a black SUV.  Caraballo matched the CI's description of Bonilla's source of supply, and he had a cell phone number with a New York area code.  Through a license plate reader search, Bonkowski confirmed that Caraballo's vehicles with Pennsylvania plates were making round trips from New London to New York on a regular basis.  Bonkowski showed the CI a photo of Caraballo and the CI confirmed that Caraballo was Bonilla's source of supply.  Bonkowski then obtained a "pen and ping" warrant for Caraballo's cell phone, which enabled her to track the phone's location.

On May 23, 2020, a Saturday, location data for the

phone showed Caraballo traveling from New London to New York City, stopping for less than 30 minutes in the Bronx, then heading back toward New London.  Bonkowski set up surveillance at the Nutmeg Woods apartment complex.  A black SUV with Pennsylvania plates arrived and two individuals wearing gray sweatshirts exited the vehicle carrying duffle bags.  Later that day, Bonkowski saw a social media photo of Caraballo and his wife in a vehicle wearing gray sweatshirts.

Two weeks later, on June 6, another Saturday, location data for Caraballo's phone showed that after driving south on I-95, and stopping briefly in the Bronx, Caraballo was returning north on I-95. Bonkowski saw Caraballo's black SUV with Pennsylvania plates pass her location on I-95.  She drove alongside the SUV and identified Caraballo as its sole occupant. She contacted another member of the task force, Detective Nathan Charron, who, in turn, contacted Troop F of the Connecticut State Police and asked for a "walled-off" stop of the SUV, explaining that the

driver was suspected of transporting narcotics.[1]

Trooper Christopher Francis located Caraballo on I-95 and tailed him for about five minutes.  Francis noticed that Caraballo was driving cautiously as if to avoid giving law enforcement officers grounds for a traffic stop.  Nonetheless, Francis saw Caraballo commit two traffic infractions: traveling in the left lane after passing other vehicles rather than moving to the right; and crossing the yellow fog line.  Francis then activated his emergency lights and initiated a stop.  Caraballo pulled over to the side of the road. Francis followed and stopped his vehicle behind Caraballo's SUV.  As shown by his dash cam video recorder, the time was 17:33.[2]

---

[1] A "walled-off" stop occurs when a police officer lawfully stops a vehicle for a traffic violation but does so at the request of narcotics investigators who suspect that the occupants are involved in drug trafficking.  In order to preserve the integrity of the drug investigation, the officer performing the stop will avoid signaling to the occupants that they are under investigation for drug trafficking.  See United States v. Gomez, 751 Fed. Appx. 63, 65 (2d Cir. 2018).  The pretextual nature of the stop does not affect its validity provided the stop is objectively supported by probable cause.  See United States v. Foreste, 780 F.3d 518, 523 (2d Cir. 2015).

[2] Caraballo's post-hearing brief does not challenge the legality of the stop.  In any event, I credit Francis's testimony and find that he had probable cause for the stop based on the

At 17:34, Francis approached Caraballo's vehicle
and told him he was being stopped because he had
crossed the fog line and failed to keep right.  Francis
asked to see Caraballo's license and vehicle
registration, which Caraballo provided, and asked him
to shut off the vehicle, which he did.  Francis asked
Caraballo about his itinerary.  Caraballo answered that
he was traveling from Pennsylvania to New London to
pick up his children.  Francis asked whether the
Pennsylvania address on Caraballo's license was valid
and whether he was feeling all right.  Caraballo said
the address was accurate.  Francis then asked if there
was anything illegal in the vehicle and whether
Caraballo would consent to a search.  Caraballo reacted
nervously and declined to consent.

At 17:35, Francis stepped away from Caraballo's

---

observed infractions.  The defendant does argue that certain
issues of fact relating to his subsequent detention should be
resolved against the government because it has failed to turn
over body worn camera footage of the stop and recordings of
radio transmissions relating to the stop.  The government
responds that there are no such recordings and if any recordings
did exist, they would be of little or no use to the defendant.
I am persuaded that the government is correct.

vehicle and spoke with Trooper Benjamin Borelli who had arrived in time to observe Francis's interaction with Caraballo.  Francis asked Borelli to radio for a drug detection canine.  Borelli returned to his vehicle, called for a K-9 handler, and spoke with Charron concerning the status of the stop.

At 17:37, Francis got back in his vehicle.  He called in the operator's license number to dispatch, then began to run checks on Caraballo's driver's license, motor vehicle registration, and criminal history.  Running all the checks took five to six minutes.

At 17:38, Borelli interrupted Francis to let him know that he had spoken with Charron and learned that Caraballo's statements concerning his current address and itinerary were false.

At 17:39, Francis approached Caraballo again.  He asked if Caraballo was coming from Pennsylvania and going to New London and Caraballo said yes.  Francis realized that Caraballo was lying.  He asked if

Caraballo had any weapons in the vehicle and Caraballo said no.

At 17:42, Trooper O'Connell arrived with his K-9, Hepburn. Francis then approached Caraballo a third time and told him that a drug-detection dog sniff was going to be conducted. Caraballo was ordered to get out of the vehicle. He was handcuffed and detained by the side of the road. During this time, he steadfastly insisted that there were no narcotics in the vehicle, but the officers were not dissuaded.

At 17:50, O'Connell and K-9 Hepburn began to circle the SUV. When they got to the front of the vehicle, she provided "secondary" alerts. When they reached the driver's door, she quickly sat and stared at O'Connell, providing a "primary alert" to the presence of narcotics. Because she sat so quickly, O'Connell was "certain" there were narcotics in the vehicle. The officers then began to search the vehicle. Fentanyl was soon found in a sealed bag under the driver's seat, and Caraballo was arrested.

II.

Under the Fourth Amendment as construed by the Supreme Court, an officer who has probable cause to believe that a motorist has violated a traffic law may stop the motorist regardless of the officer's subjective motivation for the stop.  See Whren v. United States, 517 U.S. 806, 808, 812-13 (1996).  When an officer conducts a routine traffic stop because of an observed traffic violation, as opposed to a "walled-off" stop, the officer's authority to detain and question the driver is limited by the purpose of the stop; specifically, the officer is authorized to "address the traffic violation that warranted the stop and attend to related safety concerns."  Rodriguez, 575 U.S. at 354.  The officer may "conduc[t] ordinary inquiries incident to the traffic stop, such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  United States v. Wallace, 937 F.3d 130,

138 (2d Cir. 2019)(quotations omitted).  In addition,
the Supreme Court has held that a drug-detection dog
sniff of the exterior of the vehicle does not violate
the Fourth Amendment.  See Illinois v. Caballes, 543
U.S. 405, 410 (2005)("A dog sniff conducted during a .
. . lawful traffic stop that reveals no information
other than the location of a substance that no
individual has any right to possess does not violate
the Fourth Amendment.").  However, a traffic stop
"justified only by a police-observed traffic violation
. . . become[s] unlawful if it is prolonged beyond the
time reasonably required to complete [the stop's]
mission of issuing a ticket for the violation."
Rodriguez, 575 U.S. at 350 (internal quotation
omitted).  In other words, the detention of the
motorist becomes unreasonable under the Fourth
Amendment if it continues beyond the time when "tasks
tied to the traffic infraction are - or reasonably
should have been - completed."  Id. at 354 (dog sniff
not justified as part of traffic stop because it

prolonged the stop beyond the time needed to investigate the traffic violation).

A traffic stop may be extended beyond the time required to complete traffic-related tasks – the "Rodriguez moment" - when justified by reasonable suspicion that the individual is engaged in criminal activity.  See id. at 356-58 (remanding for determination of whether dog sniff justified by reasonable suspicion of criminal activity).  Reasonable suspicion exists when an officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  Terry v. Ohio, 392 U.S. 1, 21 (1968); see United States v. Singletary, 798 F.3d 55, 59 (2d Cir. 2015).  Reasonable suspicion can be based on the officer's personal observations as well as information the officer obtains from others.  In addition, under the collective knowledge doctrine, an investigatory stop is permissible when the officer lacks specific information required for reasonable

suspicion, but sufficient information is known by other officers initiating or involved with the stop.  See United States v. Hussain, 835 F.3d 307, 316 n.8 (2d Cir. 2016); United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001).

III.

Caraballo contends that Francis extended the stop beyond the time required to complete its traffic-related objectives and, as a result, the dog sniff and subsequent search of the SUV are products of an illegal detention.  The government responds that reasonable suspicion to detain Caraballo existed before the time for completing traffic-related tasks expired so his continued detention was not constitutionally unreasonable.  I agree with the government.

Determining exactly when the time for a routine traffic stop should be deemed to have expired can be difficult.  See W. LaFave, Search and Seizure: A Treatise On the Fourth Amendment, §9.3(f) and n. 375 (6th ed. March 2024 Update)(lamenting the "need for the

complex and often nearly impossible task of calculating just when the time should be deemed to have expired in the case of a particular traffic stop"). In this case, however, the issue can be reliably determined with the aid of the dash cam video and the officers' hearing testimony.

The video corroborates Trooper Francis's testimony that he was in the process of running traffic-related checks when, at 17:38, Trooper Borelli interrupted him to report that Caraballo's statements concerning his itinerary were false. If that information provided reasonable suspicion that Caraballo had narcotics in the SUV, his continued detention was not unlawful.

Whether reasonable suspicion existed is governed by a totality of the circumstances test. See Navarette v. California, 572 U.S. 393, 397-99 (2014). Based on the evidence presented at the hearing, I find that reasonable suspicion for an investigatory stop existed no later than 17:37, when Borelli learned from Charron that Caraballo was lying about his itinerary. This

reasonable suspicion justified detaining Caraballo for a reasonable period of time pending a drug-detection drug sniff of the vehicle.  See United States v. Salas, 820 Fed. Appx. 405, 412-13 (6th Cir. 2020)(motion to suppress drugs detected in vehicle by dog sniff during pretextual traffic stop instigated by narcotics investigators properly denied because officers had reasonable suspicion vehicle contained drugs); United States v. Harry, 930 F.3d 1000, 1005 (8th Cir. 2019)(even if dog sniff extended traffic stop, extension would have been permissible because CI's tip provided reasonable suspicion that vehicle contained drugs).[3]

Because the motion to suppress turns on the existence of reasonable suspicion, review of what the

---

[3] The defendant contends that this case is controlled by United States v. Gomez, 877 F.3d 76 (2d Cir. 2017), where the Court of Appeals stated that a stop was unlawfully extended under Rodriguez but concluded that suppression was not warranted because the good faith exception to the exclusionary rule applied to the conduct of the officers.  The government contends that the defendant's reliance on Gomez is misplaced because there the Court did not reach the issue whether the extended stop was justified by reasonable suspicion that the vehicle contained heroin.  I agree with the government.

officers knew about Caraballo's drug-related activities
is warranted.  At the outset of the stop, Francis had
imputed knowledge of the information known to Bonkowski
and her colleagues on the task force as a result of
their investigation into the drug trafficking
activities of Caraballo and Bonilla.  This included the
information that enabled the task force to obtain the
"pen and ping" warrant for Caraballo's cell phone, and
the information they obtained pursuant to their
monitoring of the phone as authorized by the warrant.
In particular, this information included: the CI's
firsthand account of Caraballo's delivery of narcotics
to Bonilla; the CI's positive identification of
Caraballo as Bonilla's narcotics supplier; the CI's
information concerning Caraballo's round trips from New
London to New York City to obtain duffel-bag quantities
of heroin; the CI's description of Caraballo's black
SUV with Pennsylvania plates; Caraballo's previous
round trip from New London to the Bronx on a Saturday,
which culminated in Bonkowski's observation of

Caraballo and his wife exiting the back SUV with duffel
bags; and the location tracking data for Caraballo's
phone showing that he was presently engaged in another
Saturday round trip from New London to New York City
punctuated by a stop of less than 30 minutes in the
Bronx.

After briefly interacting with Caraballo, Francis
learned that Caraballo was lying about his itinerary
(he was en route from New York City not Pennsylvania),
his place of residence (he was living in New London,
not Pennsylvania), and the purpose of his trip (he was
not picking up his children in New London as might be
the case if he were living in Pennsylvania).  In
addition, he learned that Caraballo had a criminal
record involving drug offenses.

Francis had all this information no later than four
minutes into the stop.  During that time frame, he had
diligently undertaken tasks necessary to complete a
traffic infraction investigation.  Before all those
tasks could be completed, he had reasonable suspicion

to detain Caraballo pending a dog sniff of the vehicle.
The K-9 arrived within a few minutes.  The sniff was
delayed until Caraballo exited the vehicle, was
handcuffed and moved to the side of the road.  The
sniff then took place approximately 17 minutes after
Caraballo was pulled over.  Because the extension of
the stop was justified by reasonable suspicion of
criminal activity, Caraballo's pre-arrest detention was
not unreasonable under the Fourth Amendment.[4]

IV.

The defendant contends that the search of the SUV
violated the Fourth Amendment because the officers
lacked probable cause to believe that narcotics would
be found in the vehicle.  Probable cause to search

---

[4] The defendant does not contend that the questions Francis put
to him during the traffic stop infringed on a constitutionally
protected interest.  All the questions were legitimately part of
a traffic infraction investigation, taking account of the need
to provide for officer safety, with the possible exception of
the request for consent to search the vehicle.  The record does
not permit a finding as to whether such a request is reasonably
related to a typical traffic infraction investigation or officer
safety.  But the request for consent to search the vehicle did
not prolong the stop beyond the time required to complete tasks
tied to the traffic infractions.  Moreover, the officers had
reasonable suspicion to justify detaining Caraballo for a drug-
detection dog sniff of the SUV independently of his reaction to
the request for consent to search the vehicle.

exists if there is "a fair probability that contraband or evidence of a crime will be found."  <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  Probable cause is "a practical, nontechnical . . . fluid concept – turning on an assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  <u>Id.</u> at 231-32.  As with reasonable suspicion, whether probable cause existed for a search is determined by considering the totality of the circumstances.  <u>Id.</u> at 238.

When a properly trained dog alerts to narcotics in a vehicle, officers typically have probable cause to search the vehicle.  <u>See</u> <u>Florida v. Harris</u>, 568 U.S. 237, 246-47 (2013).[5]  The operative question is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal

---

[5] "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.  The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs."  <u>Id.</u>

contraband or evidence of a crime." Id. at 248.  In
this case, K-9 Hepburn's primary alert served to
transform reasonable suspicion that Caraballo was
transporting heroin into probable cause for a search of
the SUV.

The defendant makes two arguments regarding the
reliability of K-9 Hepburn's alert.  First, as noted
earlier, he argues that the government's failure to
produce O'Connell's bodycam footage of the stop
warrants an adverse inference.  However, the dash cam
footage clearly shows K-9 Hepburn providing a primary
alert upon sniffing the driver's door of the SUV.
Accordingly, an adverse inference cannot be drawn.[6]

Second, the defendant argues that K-9 Hepburn was
not specifically trained to detect fentanyl.  Trooper
O'Connell testified concerning his K-9's training to
become a drug-detection dog with the Connecticut State
Police.  She initially received ten weeks of training

---

[6] O'Connell credibly testified that bodycam technology was new at
the time, and he likely forgot to record or preserve the footage
in question.

then participated in quarterly training sessions.  He
also trained her "on a daily basis" to alert to heroin,
cocaine, crack cocaine, metabolic steroids, and
methamphetamine.  In addition to O'Connell's testimony,
the government has submitted an affidavit signed by
Jonathon Naples, a canine instructor with the
Connecticut State Police, who attests that, in his
experience, "narcotic detection canines trained in the
Connecticut State Police program to detect the odor of
heroin may demonstrate an observable response when in
the presence of the odor of fentanyl."  ECF No. 208-1,
¶ 12.  The canines are not specifically trained to
detect the odor of fentanyl "in part due to the dangers
presented by possible fentanyl exposures to the canine
and the handler."

I credit O'Connell's testimony and Naples's
affidavit and find that K-9 Hepburn's primary alert
would cause a reasonably prudent person to think that a
search of the vehicle would yield narcotics.  I also
find that the officers reasonably relied on K-9

Hepburn's alert to provide probable cause for the
search so that the good faith exception would apply in
any event.

V.

In his post-hearing brief, Caraballo claims that
he was subjected to a de facto arrest prior to the
search of the SUV.  This claim does not provide a basis
for suppression of the fentanyl because the officers
were authorized to search the vehicle independently of
Caraballo's arrest.  To be clear, however, I do not
think the stop became an arrest prior to the vehicle
search.

Whether an investigatory stop has become an arrest
is a fact-intensive issue that is determined on a case-
by-case basis.  Relevant facts include the diligence of
the officers in resolving their reasonable suspicion
expeditiously and the nature and extent of any
restraints placed on the individual in the interim.

Here, the officers were reasonably diligent in
carrying out their investigation.  To prepare for the

K-9 sniff and any subsequent search, they ordered

Caraballo to get out of the vehicle, handcuffed him and

moved him to the side of the road.  The officers

testified that these things were done for their safety

and the safety of Caraballo.  I credit this testimony

and conclude that restraining Caraballo in this manner

while the officers expeditiously completed the sniff

and search did not convert the stop into an arrest.

VI.

Accordingly, the motion to suppress is hereby

denied.

So ordered this 9th day of April 2024.


_____
/s/ RNC
Robert N. Chatigny
United States District Judge